GEORGE S. CARDONA
Acting United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
STEPHANIE YONEKURA McCAFFREY
(Cal. State Bar No. 187131)
Executive Assistant United States Attorney
BEONG-SOO KIM (Cal. State Bar No. 212911)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
        1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-1092/3868
        Facsimile:  (213) 894-1634
        Email: Stephanie.Yonekura-McCaffrey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


                  UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 08-746(B)-FMC |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT'S POSITION RE: |
| v. | ) | SENTENCING; EXHIBITS |
| | ) | |
| LISA LIEVANOS, | ) | Sent. Date: October 26, 2009 |
| | ) | Sent. Time: 2:00 p.m. |
| Defendant. | ) | |
| | ) | Courtroom of the Honorable |
| | | Florence-Marie Cooper |

        Plaintiff United States of America, by and through its

counsel of record, Executive Assistant United States Attorney

Stephanie Yonekura McCaffrey, hereby files its Response to

Defendant's Position Re: Sentencing.  This Response is based on

the attached memorandum of points and authorities and exhibits,

                                1

1  the files and records of this case, and any argument presented at

2  the sentencing hearing.

3  Dated: October 14, 2009   Respectfully Submitted,

4                            GEORGE S. CARDONA
                             Acting United States Attorney
5
                             CHRISTINE C. EWELL
6                            Assistant United States Attorney
                             Chief, Criminal Division
7

8                            __/s/_____
                             STEPHANIE YONEKURA McCAFFREY
9                            Executive Assistant United States
                             Attorney
10                           BEONG-SOO KIM
                             Assistant United States Attorney
11                           Deputy Chief, Major Frauds Section

12                           Attorneys for Plaintiff
                             United States of America
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

PAGE:

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . .  ii

I.    INTRODUCTION.. . . . . . . . . . . . . . . . . . . 3

II.   FACTUAL BACKGROUND.. . . . . . . . . . . . . . . . 3

      A.   Underlying Conviction.. . . . . . . . . . . . 3

      B.   PSR Loss Calculations.. . . . . . . . . . . . 5

III.  ARGUMENT.. . . . . . . . . . . . . . . . . . . . . 6

      A.   Defendant's Fraudulent Conduct Caused Actual
           Losses of $1,269,320. . . . . . . . . . . . . 6

           1.   The PSR Accurately Calculated The
                Losses.. . . . . . . . . . . . . . . . . 6

           2.   The Isle Court Losses Are Relevant
                Conduct. . . . . . . . . . . . . . . . . 10

           3.   Defendant Was Not a Victim of Predatory
                Lending. . . . . . . . . . . . . . . . . 11

      B.   Defendant Was an Integral Member of the Fraudulent
           Scheme. . . . . . . . . . . . . . . . . . . . 11

      C.   A 57-Month Sentence Is Sufficient, But Not Greater
           Than Necessary, Under the Factors Set Forth in
           18 U.S.C. § 3553(a).. . . . . . . . . . . . . 14

           1.   Nature and Circumstances of the
                Offense. . . . . . . . . . . . . . . . . 14

           2.   History and Characteristics of
                Defendant. . . . . . . . . . . . . . . . 15

           3.   Need for the Sentence Contemplated.. . . . . . . 15

           4.   Kinds of Sentences Available.. . . . . . . . . 16

           5.   Sentencing Ranges and Policy Statements. . . . 17

      D.   Need to Avoid Sentencing Disparities. . . . . . . 17

III.  CONCLUSION.. . . . . . . . . . . . . . . . . . . . 18

TABLE OF AUTHORITIES

PAGE(S):

CASES:

United States v. Crandall,
       525 F.3d 907 (9th Cir. 2008).. . . . . . . . . . . 8, 9, 10

United States v. Davoudi,
       172 F.3d 1130 (9th Cir. 1999). . . . . . . . . . 7, 8, 9, 10

United States v. Gordon,
       393 F.3d 1044 (9th Cir. 2004). . . . . . . . . . . . . . . 9

United States v. Saeteurn,
       504 F.3d 1175 (9th Cir. 2007). . . . . . . . . . . . . . 18

STATUTE:

18 U.S.C. § 3553(a).. . . . . . . . . . . . . . . . 3, 14, 16

# I.

## INTRODUCTION

As stated in its initial Sentencing Position, the government concurs with the Probation Office's recommendation that the Court sentence defendant Lisa Lievanos ("defendant") to a 57-month term of imprisonment and three years supervised release.  The recommended sentence is sufficient, but not greater than necessary, considering the factors enumerated in 18 U.S.C. § 3553(a) and the advisory guideline range of 57 to 71 months based upon an offense level of 25.  In Defendant's Position Re: Sentencing, defendant argues that, notwithstanding the Probation Office's Presentence Report ("PSR") and Recommendation, (1) the loss amount in this case should be zero, (2) she should receive a four-level downward departure for being a minimal participant, and (3) she should receive a probationary sentence.  These arguments should be rejected as inconsistent with the facts in this case and well-established law.

# II.

## FACTUAL BACKGROUND

A.  Underlying Conviction

On April 20, 2009, a jury convicted defendant of (1) one count of conspiracy to commit wire fraud; (2) two counts of wire fraud in connection with the submission of false loan applications for the alleged purchase of 6133 Chantel Drive, Fontana, California ("Chantel property") and the refinance of 15359 Jeanette Drive, Fontana, California ("Jeanette property"); (3) one count of engaging in monetary transactions with proceeds from specified unlawful activity, here the receipt of a $20,000

3

cashier's check purchased with the proceeds of wire fraud in connection with a fraudulently obtained loan for the alleged purchase of 7069 Isle Court, Rancho Cucamonga, California ("Isle Court property"); and (4) one count of making a false statement to the Federal Bureau of Investigation ("FBI") about the reason for the receipt of the $20,000 cashier's check.[1]

For the Chantel property, Jeanette property, and Isle Court property, defendant's name and personal identifying information were used to fraudulently obtain loans.  The loan applications for these properties contained false information concerning defendant's employment, income, and intention to live in the property.  (Gov. Exhs. 1-3; PSR, ¶¶ 15, 22, 26).  In particular, the loan applications for the three loans listed the same false employment, claiming defendant worked at Ace Financial when she did not.  In addition, the Chantel property and Isle Court property loan applications listed defendant's monthly income as $12,900 and $29,700, respectively, when in truth and in fact, defendant did not have an income earning job.[2]  (Gov. Exhs. 1 & 3).  Finally, each loan was applied for as a primary residence, when in truth and in fact, defendant did not intend to and never did live in the Chantel or Isle Court properties.  (Gov. Exhs. 1-3).

---

[1]Defendant was acquitted of Count Four, the wire fraud count relating to the Isle Court property.

[2]The only record of income earned by defendant from 2005 through 2007 was $21.70 in 2005 at the Etiwanda School District. (Gov. Exh. 26).

As a result of the fraudulent scheme, defendant received $186,000 in fraudulently obtained loan proceeds.[3]  (Gov. Exhs. 8-12).  From the fraudulently obtained loan for the Chantel property, defendant received $15,000.  (PSR, ¶ 21).  From the fraudulently obtained loan for the Jeanette property, defendant and her husband, Jose Lievanos, received over $150,000.  (PSR, ¶¶ 13, 24).  From the fraudulently obtained loan for the Isle Court property, defendant received and deposited a $20,000 cashier's check that she received from co-schemer Angela Cotton ("Cotton").  (PSR, ¶ 29).

On August 21, 2007, FBI Special Agents interviewed defendant, and she told them that the $20,000 cashier's check from Orange Title was a loan referral fee but refused to tell them whom she referred, whom she knew at Orange Title, and who gave her the check.  (Exh. A, FBI-302, August 21, 2007; PSR, ¶ 30).  On April 1, 2008, FBI Special Agents interviewed defendant again and defendant's story about the $20,000 cashier's check changed -- this time, she told them that Cotton was paying her back for a personal loan.  (Exh. B, FBI-302, April 1, 2008; PSR, ¶ 31).

B.  PSR Loss Calculations

The PSR calculated the actual loss resulting from defendant's fraudulent conduct as $1,269,320.  (PSR, ¶ 45).  The $1,269,320 includes losses associated with the fraudulently

---

[3]    In this regard, the PSR contains a typographical error. In paragraph 13, it references the $35,000 in fees paid to defendant by Cotton and the $151,000 received by defendant as proceeds from the Jeanette loan, but then suggests that the total of these amounts is $126,000, when in fact it is $186,000.

1  obtained loans for the Chantel, Jeanette, and Isle Court

2  properties.  For the Chantel property loan, the loss represents

3  the outstanding loan balance less the fair market value of the

4  property.  (PSR, ¶ 20).  For the Jeanette property loan, the loss

5  represents the outstanding loan balance less the amount recovered

6  by the financial lending institution through the foreclosure sale

7  of the property.  (PSR, ¶ 25).  For the Isle Court property loan,

8  the entire loan amount less loan payments made is the actual loss

9  suffered because the Isle Court property was not for sale and the

10  financial lending institution did not receive any collateral,

11  _i.e._, a lien on the property, to offset its loss.  (PSR, ¶ 27).

III.

ARGUMENT

A.  Defendant's Fraudulent Conduct Caused Actual Losses of
    $1,269,320.

1.  The PSR Accurately Calculated The Losses.

The loss attributed to defendant is $1,269,320 based on the
amounts of the fraudulently obtained loans offset by the amounts
recovered or expected to be recovered by the defrauded financial
lending institutions.[4]

In mortgage fraud cases where false statements are submitted
to obtain loans, "the loss is the amount of the loan not repaid
_at the time the offense is discovered_, reduced by the amount the

_____

[4]It appears that Aurora, the lender that foreclosed on
defendant's Chantel loan, sold the property for $325,000 -- less
than the fair market value of $400,200 set forth in the PSR (see
paragraph 20) -- as recorded with San Bernardino County on July
24, 2009 (before the disclosure of the PSR).  The information has
not been independently verified, however, and, if accurate, would
not affect defendant's guideline calculations.

1  lending institution has recovered (or can expect to recover) from

2  any assets pledged to secure the loan." U.S. v. Davoudi, 172

3  F.3d 1130, 1135 (9th Cir. 1999) (quoting Application note 8(b) to

4  U.S.S.G. § 2F1.1) (emphasis in original).[5]  In Davoudi, the

5  defendant overstated his income in loan applications to federally

6  insured banks.  Id. at 1132.  The banks relied on the false

7  statements to fund the loans, and the defendant eventually

8  defaulted on the loans.  Id. at 1133.  The Ninth Circuit used the

9  actual sale price to offset the loss and rejected Davoudi's

10  argument that the valuation of the property at the time that the

11  offense was discovered should be used.  Id. at 1135.  The Ninth

12  Circuit held that the defendant caused any losses suffered,

13  including losses caused by an unforeseen decline in the market.

14  Id.

> If the bank suffers losses after the offense is
> discovered because of a falling market or even through
> its own improvident management, those consequential
> losses can be attributed to the defendant's conduct for
> purposes of Guidelines sentencing.

18  Id.  Davoudi is supported by Annotation Note 3(E)(ii) to U.S.S.G.

19  § 2B1.1, which states: "Loss shall be reduced by the following

20  . . .  In a case involving collateral pledged or otherwise

21  provided by the defendant, the amount the victim has recovered *at*

22  *the time of sentencing* from disposition of the collateral, or if

23  the collateral has not been disposed of by that time, the fair

24  market value of the collateral at the time of sentencing."

25  (emphasis added).

---

27  [5]Case law relating to U.S.S.G. § 2F1.1 is applicable to
U.S.S.G. § 2B1.1.  "Section 2F1.1 . . . was deleted by
28  consolidation with §2B1.1 effective November 1, 2001."  U.S.S.G.
§ 2F1.1 (November 1, 2008 edition).

1    <u>Davoudi</u> is directly on point here. Defendant and her co-

2    schemers submitted loan applications to financial lending

3    institutions that contained false statements about her income,

4    employment, and intention to live in the properties.  As

5    demonstrated at trial and validated by the jury's conviction of

6    defendant, the financial lending institutions considered the

7    false statements to be material to their decision to fund the

8    loans.  As calculated in the PSR, the losses suffered by the

9    financial lending institutions are the outstanding loan balances

10   at the time the offenses were discovered less the amount the

11   financial lending institutions have recovered for the Jeanette

12   property or can expect to recover for the Chantel property.

13   <u>Davoudi</u>, 172 F.3d at 1135.  For the Isle Court property, there is

14   no offset to the outstanding loan balance because the Isle Court

15   property was not actually for sale and no collateral was pledged.

16   <u>Id.</u>

17        Defendant argues that the loss attributed to the

18   fraudulently obtained loans for the Chantel and Jeanette

19   properties should be zero because the loans were based on

20   legitimate appraisals and the decline in the market should not be

21   attributed to defendant.[6]   Defendant attempts to cite <u>United</u>

22   <u>States v. Crandall</u>, 525 F.3d 907 (9th Cir. 2008), for the

23   proposition that fraud loss can be determined in several

24   different ways in the real estate context.  <u>Crandall</u> is

25   completely inapplicable to this case.  In <u>Crandall</u>, the

26

27        [6]This argument assumes facts not in evidence.  No analysis

28   of the legitimacy of the appraisals was ever conducted by either
     party.

1  defendants sold to victim buyers individual apartments that had

2  been fraudulently converted to condominiums.  Id. at 910.  The

3  apartments were ultimately legally converted to condominiums.

4  The Ninth Circuit determined that the defendants should not

5  benefit from the later legal conversion and held that

> *in this case*, the actual loss to the victims at the
> time of the fraud, as opposed to the time of trial or
> sentencing, best captures Defendants' culpability.  The
> volatile nature of the real estate market is wholly
> independent of Defendants' actions and, for sentencing
> purposes, they should not benefit from the conversion
> of the units to condominiums.

10  Id. at 915 n. 8 (citing United States v. Gordon, 393 F.3d 1044,

11  1052 n. 6 (9th Cir. 2004)[7] (emphasis added).  The Ninth Circuit

12  acknowledged the difficulty in determining how to calculate the

13  loss caused by this fraud given the fact that, although the units

14  could be difficult or impossible to resell, the victim buyers

15  could live in the apartments or rent them out.  Id. at 913.  The

16  Ninth Circuit suggested several different ways to calculate loss

17  and stated that "whatever approach, the district court takes, it

18  must take a realistic, economic approach that reflects the

19  monetary loss to the victims of the fraud."  Id. at 915.

20      Under the facts of this case, where defendant submitted

21  fraudulent loan applications to financial lending institutions

22  that contained material false statements, the Ninth Circuit has

23  already determined that loss is calculated by taking the

24  outstanding loan balance less the amount recovered or expected to

25  be recovered *at the time of sentencing*.  Davoudi, 172 F.3d at

26  1135 (emphasis added).  In addition, Davoudi also held that any

27

28      [7]Gordon was an insider trading case and inapplicable to a
determination of loss calculations in a mortgage fraud case.

1  decline in the market which increases the losses to the defrauded

2  financial lending institutions are properly attributed to

3  defendant.  Id.  In sum, calculating loss in the manner set forth

4  in Davoudi constitutes "a realistic, economic approach that

5  reflects the monetary loss to the victims of the fraud."

6  Crandall, 525 F.3d at 915.

7       2.   The Isle Court Losses Are Relevant Conduct.

8       Defendant argues that the loss amount associated with the

9  fraudulently obtained loan for the Isle Court property should not

10 be attributed to her because she was not convicted of wire fraud

11 in connection with that loan.  That argument is not persuasive

12 for several reasons.  First, the jury convicted defendant of

13 conspiracy to commit wire fraud by submitting false loan

14 applications in her name.  The Isle Court loan was obtained in

15 her name; contained false statements about her employment,

16 income, and intention to live at the property; and was plainly

17 alleged as part of defendant's conspiracy.  Accordingly, the

18 losses from Isle Court loan should be included in the loss

19 resulting from her conviction of that count.  Second, the jury

20 also convicted defendant of money laundering in connection with

21 the Isle Court loan, finding that defendant engaged in a monetary

22 transaction, i.e., receiving a $20,000 cashier's check, involving

23 funds from a specified unlawful activity, namely wire fraud.

24 Under U.S.S.G. § 2S1.1, the amount of loss for that conviction

25 depends on whether defendant committed the underlying offense

26 (i.e., the wire fraud), in which case the amount of loss from

27 that underlying offense should be included.  In this case, the

28 government has proven defendant's fraudulent involvement with the

Isle Court loan by clear and convincing evidence, even if the jury found that this evidence did not meet the standard of proof beyond a reasonable doubt.  Third, even if defendant had not been convicted of both conspiracy and money laundering, the Isle Court loan losses would still constitute relevant conduct under U.S.S.G. § 1B1.3, since these losses resulted from the same overall scheme in which defendant submitted the fraudulent Chantel and Jeanette property loans.  For all of these reasons, the Isle Court loan losses are properly attributed to defendant's fraudulent conduct.

     3.   <u>Defendant Was Not a Victim of Predatory Lending.</u>

     Defendant uses seven pages in her Position Re: Sentencing to describe subprime loans and predatory lending.  None of this is relevant to the calculation of defendant's loss.  The jury did not find that defendant was an innocent victim of predatory lending.  Rather, they convicted her of involvement in a fraudulent scheme to defraud financial lending institutions by knowingly submitting applications for loans that contained material false statements about her income, employment, and intention to live in the properties.

     The applicable loss is $1,269,320, resulting in a 16-level increase to the total offense level.  As discussed further below, that increase not only is justified by the facts of this case, but also provides an accurate measuring stick of defendant's moral culpability.

B.   <u>Defendant Was an Integral Member of the Fraudulent Scheme.</u>

     U.S.S.G. § 3B1.2 provides for a two- to four-level downward departure for minor and minimal participants.  Minimal

participants are those "who are plainly amoung the least culpable of those involved in the conduct of a group."  U.S.S.G., § 3B1.2, App. Note 4.  A minor participant means any participant "who is less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G., § 3B1.2, App. Note 5. For a role reduction to apply, the offender must be "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, App. Note 1.

As the Probation Office properly concluded, none of these minor-role provisions applies here.  Defendant's participation was a key component of the fraudulent scheme.  First, she fraudulently identified herself to the victim lenders as the borrower.  Second, she provided false information in the loan applications about her employment, income, and intention to live in the properties that was relied upon by the victim lenders. Third, she lied to the case agents when approached about the fraudulent scheme.  Finally, she received $186,000 of the fraudulently obtained loan proceeds for her participation.  In short, defendant's conduct was extensive, deliberate, and critical.

Nor was defendant substantially less culpable than most of the other participants.  The government agrees that defendant is less culpable than co-schemer Cotton, who was the leader and organizer of the scheme, and that co-schemer Cotton was involved in other fraudulent conduct not attributable to defendant.[8]  What

---

[8]Defendant misstates the potential exposure of co-schemer Cotton.  The guideline calculations set forth in Cotton's plea agreement include only the calculations to which the parties would stipulate – base offense level and loss of $4,058,898.  The

defendant's argument misses, however, is that the fraud at issue in her case involves only the three fraudulent loans obtained in her name, not all of the fraudulent loans associated with Cotton. Other participants in the loan fraud who were equally or less culpable than defendant include (1) the notary who allegedly allowed her notary stamp to be used on the grant deeds for $10,000 a loan; (2) Miles Davis, the loan processor who was convicted of structuring and received approximately $8,500 to $13,000 for his involvement in the Isle Court loan; (3) Patricia Palasty-Easton, the loan processor who was convicted of false statements in connection with her receipt of approximately $25,000 to $30,000 from Miles Davis from the proceeds of the Isle Court loan; and (4) T.G., defendant's boyfriend, and C.J., T.G.'s ex-wife, who "sold" the Chantel property to defendant as a straw buyer to obtain some of the equity from the property.

The facts of this case do not warrant a downward role adjustment.

///

///

///

---

government reserved the right to argue, and intends to argue, other specific offense characteristics and adjustments including, but not limited to, aggravated role and obstruction of justice.

C.   A 57-Month Sentence Is Sufficient, But Not Greater Than
     Necessary, Under the Factors Set Forth in 18 U.S.C.
     § 3553(a).

     1.   Nature and Circumstances of the Offense

     The nature and circumstances of defendant's offense
warrant a custodial sentence of 57 months, which is a sentence at
the low-end of the guideline range.

     Defendant participated in a scheme to defraud financial
lending institutions on two separate occasions, the Chantel and
Jeanette loans, and engaged in monetary transactions involving
the proceeds of a third fraudulently obtained loan for the Isle
Court property.  Defendant's criminal conduct spanned over 20
months – beginning with the submission of a fraudulent loan for
the Chantel property and continuing through her lie to the FBI
about her receipt of fraudulently obtained loan proceeds.  As set
forth above, she was an integral member of the conspiracy – the
fraudulent loans could not have been obtained without the use of
her as a straw buyer.  Through the fraudulent scheme, defendant
caused losses to the victim lenders of $1,269,320 and personally
received $186,000 of the fraudulent loan proceeds.

     For these reasons, a low-end guideline sentence of 57 months
is sufficient, but not greater than necessary, to account for the
nature and circumstances of the offense.

14

1        2.   History and Characteristics of Defendant

2        The custodial sentence recommended by the government also

3   takes into account the history and characteristics of

4   defendant as provided in Section 3553(a)(1).

5        Defendant has yet to take responsibility for her criminal

6   conduct.  She continues to blame the victim lenders for the

7   losses suffered in this case rather than acknowledge her own

8   fraudulent conduct and her receipt of tens of thousands of

9   dollars in illegally obtained funds.  The government acknowledges

10   that mitigating factors exist in this case, such as the lack of

11   any prior criminal history and defendant's children, and has

12   taken these considerations into account in its low-end Guidelines

13   recommendation.  Even though mitigating factors exist, defendant

14   still committed these offenses over several months and used the

15   money for her personal benefit[9] with little or no concern for the

16   effect on her victims.  As the PSR points out, it is unclear what

17   defendant did with the proceeds of her conspiracy, besides buying

18   a Chrysler 300 sedan.  (PSR ¶ 93).

19        Defendant has not held a stable income earning job since

20   before 2005.  She is currently unemployed and homeless.  Given

21   her current status, she is unlikely to make any restitution

22   payments beyond nominal payments to the victim lenders.

23        3.   Need for the Sentence Contemplated

24        Section 3553(a)(2) provides that the Court at sentencing

25   shall consider the "need for the sentence imposed."  The relevant

26   _____

27        [9]Between the Chantel loan and the Jeanette refinance loan,
    defendant purchased a $56,000 Chrysler 300 sedan, claiming that
28   she earned $12,000 a month at Ace Financial, when she knew that
    she didn't have an income earning job.  Gov. Exh. 32.

                                   15

considerations for this factor include the seriousness of the offense, the need to promote respect for the law, to provide adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed training, medical care, or correctional treatment in the most effective manner.  See 18 U.S.C. § 3553(a)(2).  Applying these considerations to this case, the government's recommended 57-month prison term is reasonable and appropriate.

The government's recommended sentence promotes respect for the law, not only for this defendant, but for others who might seek to commit mortgage fraud -- an area of crime in which, as the Court knows, fraud is rampant.  Additionally, given the fact that defendant committed these offenses over the course of several months, the government believes that a custodial sentence is necessary to protect the public from future crimes of defendant and better impress on defendant -- and others -- the consequences of the criminal behavior in this case.  Defendant's utter lack of remorse for her conduct gives the government little comfort that she will not recidivate.  Under the heading "Acceptance of Responsibility," the Probation Office notes that, when asked to discuss her participation in the offense, all that defendant said was that she "went to trial and lost."  (PSR ¶ 34).

### 4.   Kinds of Sentences Available

Section 3553(a)(3) states that the Court shall consider the "kinds of sentences available."  Given the seriousness of the defendant's crime, which involved a mortgage fraud scheme that defrauded financial lending institutions of over $1.2 million,

16

1  defendant should be sentenced to a term of incarceration.

2  Indeed, under the advisory guidelines, a sentence of imprisonment

3  is generally required if the sentencing range for the defendant's

4  total offense level and criminal history category are within

5  "Zone D" of the guidelines sentencing table.  U.S.S.G., Ch. 5,

6  Pt. A and § 5C1.1(f).  In this case, defendant's sentencing range

7  clearly falls within Zone D.

8      5.   Sentencing Ranges and Policy Statements

9      Section 3553(a)(4) provides that the Court shall consider

10  "the kinds of sentence and the sentencing range established for

11  . . . the applicable category of offense committed by the

12  applicable category of defendant as set forth in the guidelines

13  . . . ."  Section 3553(a)(5) states that the Court should also

14  consider any pertinent policy statement issued by the Sentencing

15  Commission.

16      The guidelines represent the Commission's policy

17  determination that other defendants in the same circumstances as

18  defendant, with an offense level of 25 and in criminal history

19  category I, could expect to serve between 57 and 71 months.  As

20  discussed above, the guidelines also reflect a clear policy that

21  the minimum amount of time in that range should be served in

22  prison.  A 57-month custodial sentence, the low-end of the range

23  corresponding to the total offense level and applicable criminal

24  history category, is therefore reasonable and appropriate.

25      D.   Need to Avoid Sentencing Disparities

26      Section 3553(a)(6) provides that the Court shall consider

27  "the need to avoid unwarranted sentencing disparities among

28  defendants with similar records who have been found guilty of

17

similar conduct."  Courts have explained that, when Congress enacted Section 3553(a)(6), it was primarily concerned with promoting "national uniformity in sentencing rather than uniformity among co-defendants in the same case."  <u>United States v. Saeteurn</u>, 504 F.3d 1175, 1181 (9th Cir. 2007).

Defendant points to the sentences of Easton and Davis in arguing that a sentence of imprisonment would result in a sentencing disparity.  As discussed above, Easton and Davis were convicted of false statement and structuring, respectively. Defendant was convicted of conspiracy, wire fraud, transactions in criminally derived property, and false statements to the FBI. Easton and Davis were only involved in one fraudulent loan transaction, received less money than defendant for their involvement in their fraudulent scheme, and accepted responsibility for their criminal conduct.  Therefore, neither Easton nor Davis were convicted of "similar conduct" and their sentences should not be considered in determining defendant's sentence.  A sentence of 57 months is within the guideline range. Accordingly, the recommended sentence would helps to achieve the national uniformity in sentencing that Congress sought in enacting Section 3553(a)(6).

III.

CONCLUSION

The government respectfully submits that a sentence of imprisonment at the low-end of the guidelines is sufficient, but not greater than necessary, to punish defendant for her misconduct, promote respect for the law, and deter defendant and others from committing similar crimes in the future.

Accordingly, the government respectfully requests that the Court

sentence defendant to a term of 57 months imprisonment, a

three-year period of supervised release, and order the defendant

to pay mandatory restitution of $1,327,714 and a special

assessment of $500.

Dated:   October 14, 2009    Respectfully Submitted,

GEORGE S. CARDONA
Acting United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


___/s/_____
STEPHANIE YONEKURA McCAFFREY
Executive Assistant United States
Attorney
BEONG-SOO KIM
Assistant United States Attorney
Deputy Chief, Major Frauds Section

Attorneys for Plaintiff
United States of America

<u>CERTIFICATE OF SERVICE</u>

I, **VERONICA BARAJAS,** declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**GOVERNMENT'S RESPONSE TO DEFENDANT'S POSITION RE: SENTENCING; EXHIBITS**

**service was:**

| | |
|---|---|
| [ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows: | [ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows: |
| [X] By hand delivery addressed as follows: | [ ] By facsimile as follows: |
| [ ] By messenger as follows: | [ ] By federal express as follows: |

**EUNICE HABIG**
**U.S. Probation Officer**
**312 N. Spring Street, 7th Floor**
**Los Angeles, CA 90012**

This Certificate is executed on **October 15, 2009,** at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

_____
/s/
**VERONICA BARAJAS**